IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs December 1, 2021

IN RE ERIN N. ET AL.

Appeal from the Juvenile Court for Sullivan County
Nos. 19-JV-42759, 18-JV-42260          Mark H. Toohey, Judge

_____

No. E2021-00516-COA-R3-PT
_____

In this case involving termination of the father's parental rights to his children, the Sullivan County Juvenile Court ("trial court") determined that several statutory grounds for termination had been proven by clear and convincing evidence. The trial court further determined that clear and convincing evidence demonstrated that termination of the father's parental rights was in the children's best interest. The father has appealed. Discerning no reversible error, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

THOMAS R. FRIERSON, II, J., delivered the opinion of the court, in which W. NEAL MCBRAYER and KENNY W. ARMSTRONG, JJ., joined.

Elizabeth A. Brady, Johnson City, Tennessee, for the appellant, Harvey Lee N.

Herbert H. Slatery, III, Attorney General and Reporter, and Jordan K. Crews, Senior Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

I.  Factual and Procedural Background

On February 8, 2018, the Tennessee Department of Children's Services ("DCS") filed a petition seeking temporary legal custody of Erin N. and Harmony N. ("the Children"), who were approximately eight years old and five years old, respectively, at the time. DCS alleged that the Children were dependent and neglected as to both their parents pursuant to Tennessee Code Annotated § 37-1-102(b)(13). Chanoa Bledsoe, a DCS case worker, traveled to the home of the Children's father, Harvey N. ("Father"), on January 24,

2018, in response to a referral containing allegations of drug exposure, lack of supervision, and environmental neglect.[1] At the time of Ms. Bledsoe's visit to the home, Father was incarcerated for an assault charge, and the Children were residing with their mother, Dora N. ("Mother"), and Father's paramour, D.C., both of whom refused to submit to drug screens. However, Mother purportedly admitted to recent drug use, and D.C. allegedly admitted to using benzodiazepine within the two weeks prior to the Children's removal, as well as Subutex and marijuana within the preceding month. According to the petition, the house was messy, and the Children had been sharing a twin mattress on the floor.

In the petition, DCS averred that Father was released from jail on January 31, 2018, and then re-arrested for methamphetamine possession and felony gun charges on February 7, 2018. As a result, DCS requested that the trial court enter an immediate protective custody order, granting DCS temporary custody of the Children. On February 8, 2018, the trial court entered a protective custody order, finding probable cause that the Children were dependent and neglected relative to both parents.

On March 27, 2018, DCS filed a motion requesting that the trial court consider proof on the issue of severe child abuse based on the Children's drug exposure. DCS alleged in its motion that a hair follicle drug screen performed on February 1, 2018, revealed that Harmony had been exposed to buprenorphine; a hair follicle drug screen accomplished on February 12, 2018, revealed that Harmony had been exposed to amphetamine, methamphetamine, and cocaine; and a hair follicle drug screen performed on February 12, 2018, revealed that Erin had been exposed to methamphetamine.[2] DCS further averred that Mother had tested positive for methamphetamine on February 28, 2018, and that Father had tested positive for methamphetamine, amphetamine, marijuana, buprenorphine, and cocaine on March 1, 2018. DCS subsequently withdrew its request for a finding of severe child abuse.

Father was released shortly following his February 2018 arrest, but the record is not clear as to the exact date of his release. Nevertheless, Father was re-arrested on April 18, 2018, and remained incarcerated until August 20, 2018. As a result of Father's arrest, the trial court entered an order on May 9, 2018, suspending Father's ability to visit with the Children until he was released from jail. The court also required Father to pass a drug screen before each visit with the Children.

DCS developed a permanency plan on March 5, 2018, which was ratified by the trial court on July 25, 2018, during a hearing at which Father was present. The court

---

[1] The paternal grandmother ("Paternal Grandmother") had filed a petition for emergency custody of the Children on January 23, 2018. In her petition, Paternal Grandmother claimed that Father was currently in jail and that the Children had been living in a "meth known house." Paternal Grandmother later dismissed her petition.

[2] We note that Subutex is a brand name for buprenorphine.

- 2 -

entered an order on September 7, 2018, reflecting its findings from the July hearing that the tasks outlined in the plan were reasonable and related to achieving permanency for the Children. The court also found that the parents had been informed of their parental responsibilities set forth in the plan. The order reflected that Father and Mother had stipulated to a finding of the Children's dependency and neglect. As such, the court adjudicated the Children dependent and neglected as to both parents by clear and convincing evidence.

On December 5, 2018, Father was arrested and subsequently incarcerated in Virginia. Father was charged with the felonious possession of a firearm while committing or attempting to commit illegal manufacture, sale, or distribution of a controlled substance; felony possession of a controlled substance; felony possession of ten grams or more of methamphetamine; and ninety-five counts of possession of child pornography.

On February 4, 2019, DCS filed a petition to terminate the parental rights of Father and Mother to the Children, alleging several statutory grounds concerning both parents. Mother subsequently surrendered her parental rights to the Children.[3] With respect to Father, DCS alleged the following grounds as a basis for termination: (1) abandonment by failure to provide a suitable home for the Children, (2) abandonment by an incarcerated parent through failure to visit the Children, (3) abandonment by an incarcerated parent through failure to financially support the Children, (4) abandonment by an incarcerated parent through exhibition of wanton disregard for the Children's welfare prior to incarceration; (5) substantial noncompliance with the permanency plan, (6) persistence of the conditions leading to the Children's removal, (7) severe child abuse, and (8) failure to manifest an ability and willingness to assume legal and physical custody of and financial responsibility for the Children.

The trial court conducted a bench trial on January 6, 2021, and announced its findings of fact and conclusions of law during a hearing on February 26, 2021. In its final order terminating Father's parental rights to the Children, the court determined that DCS had presented clear and convincing evidence to support all of its alleged grounds for termination. In addition, the court considered the best interest of the Children and concluded that termination of Father's parental rights was in the Children's best interest. Father timely appealed.

## II. Issues Presented

Father raises the following issues on appeal, which we have restated slightly as follows:

---

[3] Inasmuch as Mother is not a party to this appeal, this Opinion will focus solely on the grounds alleged against Father.

1. Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of abandonment by failure to provide a suitable home.

2. Whether the trial court erred by finding clear and convincing evidence supporting the statutory grounds for termination of Father's parental rights of abandonment by an incarcerated parent, including failure to visit, failure to support, and wanton disregard.

3. Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of substantial noncompliance with the permanency plan.

4. Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of persistence of the conditions leading to removal of the Children.

5. Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of severe child abuse.

6. Whether the trial court erred by finding clear and convincing evidence supporting the statutory ground for termination of Father's parental rights of failure to manifest an ability and willingness to assume custody of or financial responsibility for the Children.

7. Whether the trial court erred by finding clear and convincing evidence that it was in the Children's best interest to terminate Father's parental rights.

## III.  Standard of Review

In a termination of parental rights case, this Court has a duty to determine "whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence." *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).  The trial court's findings of fact are reviewed *de novo* upon the record, accompanied by a presumption of correctness unless the evidence preponderates against those findings. *See* Tenn. R. App. P. 13(d); *see also In re Carrington H.*, 483 S.W.3d 507, 523-24 (Tenn. 2016); *In re F.R.R., III*, 193 S.W.3d at 530.  Questions of law, however, are reviewed *de novo* with no presumption of correctness. *See In re Carrington H.*, 483 S.W.3d at 524 (citing *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009)).  The trial court's determinations regarding witness credibility are entitled to great weight on appeal and shall not be

- 4 -

disturbed absent clear and convincing evidence to the contrary. *See Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002).

"Parents have a fundamental constitutional interest in the care and custody of their children under both the United States and Tennessee constitutions." *Keisling v. Keisling*, 92 S.W.3d 374, 378 (Tenn. 2002). It is well established, however, that "this right is not absolute and parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Santosky v. Kramer*, 455 U.S. 745 (1982)). As our Supreme Court has explained:

> The parental rights at stake are "far more precious than any property right." *Santosky* [*v. Kramer*], 455 U.S. [745,] 758-59 [(1982)]. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of ["]severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); *see also Santosky*, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty, N.C.*, 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).
>
> Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. *Santosky*, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.* 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).
>
> * * *
>
> In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance

- 5 -

of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. *In re Bernard T.*, 319 S.W.3d at 596-97.

*In re Carrington H.*, 483 S.W.3d at 522-24. "[P]ersons seeking to terminate [parental] rights must prove all the elements of their case by clear and convincing evidence," including statutory grounds and the best interest of the child. *See In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010).

IV. Statutory Grounds for Termination of Father's Parental Rights

Tennessee Code Annotated § 36-1-113 (2021) lists the statutory requirements for termination of parental rights, providing in relevant part:

(a)   The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate parental or guardianship rights to a child in a separate proceeding, or as a part of the adoption proceeding by utilizing any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

* * *

(c)   Termination of parental or guardianship rights must be based upon:

(1)   A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2)   That termination of the parent's or guardian's rights is in the best interests of the child.

In its final order, the trial court concluded that the evidence clearly and convincingly supported a finding of eight statutory grounds to terminate Father's parental rights: abandonment through failure to provide a suitable home, *see* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(ii); abandonment by an incarcerated parent through failure to visit, failure to financially support, and exhibition of wanton disregard for the Children's welfare, *see* Tenn. Code Ann. §§ 36-1-113(g)(1), 36-1-102(1)(A)(iv), -102(1)(B), -102(1)(C), -102(1)(D), and -102(1)(E); substantial noncompliance with the permanency plan, *see* Tenn. Code Ann. §§ 36-1-113(g)(2), 37-2-403; persistence of the conditions leading to the Children's removal, *see* Tenn. Code Ann. § 36-1-113(g)(3); severe child abuse, *see* Tenn. Code Ann. §§ 36-1-113(g)(4), 37-1-102(b)(27); and failure to manifest an ability and willingness to assume legal and physical custody of or financial

responsibility for the Children, *see* Tenn. Code Ann. 36-1-113(g)(14).  Father has challenged on appeal the trial court's finding as to each statutory ground, and we will address each ground in turn.

## A.  Statutory Abandonment

Concerning statutory abandonment, Tennessee Code Annotated § 36-1-113(g)(1) (2021) provides as relevant to this action:

(g)    Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g).  The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

   (1)    Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred; . . .

Tennessee Code Annotated § 36-1-102(1)(A) (Supp. 2019) provides the following definitions of abandonment as pertinent here:

   (ii)    (a)    The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

            (b)    The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

            (c)    For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child

at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

* * *

(iv) A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration, or the parent or guardian has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child. If the four-month period immediately preceding the institution of the action or the four-month period immediately preceding such parent's incarceration is interrupted by a period or periods of incarceration, and there are not four (4) consecutive months without incarceration immediately preceding either event, a four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to commencement of the action and moving back in time. Periods of incarceration of less than seven (7) days duration shall be counted as periods of nonincarceration. Periods of incarceration not discovered by the petitioner and concealed, denied, or forgotten by the parent shall also be counted as periods of nonincarceration. A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]

We will address each abandonment ground in turn.

### 1. Failure to Provide a Suitable Home

Father contends that the trial court erred in finding by clear and convincing evidence that he abandoned the Children by failing to provide a suitable home, specifically arguing

- 8 -

that the Children were not removed by DCS from his home but rather the home of Paternal Grandmother and that DCS made no reasonable efforts to assist him in establishing a suitable home for the Children. The trial court found that the Children had been removed from Father's legal custody on February 8, 2018, and that it had previously adjudicated the Children dependent and neglected as to Father. In addition, the court found that reasonable efforts could not have been made to prevent removal, that DCS had made reasonable efforts to assist Father, and that Father had failed to make any reasonable efforts to provide a suitable home for the Children. After thoroughly reviewing the record, we conclude from the evidence that the trial court did not err in making these findings.

Father first argues that DCS presented insufficient evidence to prove this abandonment ground because the Children were allegedly removed from Paternal Grandmother's home rather than his own home. However, the evidence presented at trial does not support Father's assertion. Travis Sherfey, the DCS case worker assigned to this case from February 8, 2018, until October 19, 2018, testified that the Children were residing in Father's home at the time of their removal to DCS custody. Father also answered affirmatively when questioned regarding whether the Children were staying at his home with Mother and his paramour, D.C.

In any event, DCS was not required to prove that the Children had been removed from Father's home in order to establish this abandonment ground. With the legislature's 2018 amendment of Tennessee Code Annotated § 36-1-102(1)(A)(ii), a finding of this abandonment ground is no longer contingent on the removal of the child from the parent's home. Instead, the amended statute indicates that the petitioner can satisfy this element of the abandonment ground by proving that "[t]he child has been removed from the home <u>or the physical or legal custody of a parent</u> . . . ." (emphasis added). As previously noted by this Court, the amendment to this abandonment ground "likely removes the anomalous result of making this ground inapplicable in the cases where a lack of suitable home is most obvious and in need of remediation—when a parent has no home whatsoever for the child to be placed." *In re Ronon G.*, No. M2019-01086-COA-R3-PT, 2020 WL 249220, at *6 n.9 (Tenn. Ct. App. Jan. 16, 2020).

Furthermore, although it appears that Father was arrested on February 7, 2018, and the Children were not placed into DCS custody until the following day, the Children were still in Father's legal custody at the time of their removal.[4] *See In re Rahjada W.*, No. E2019-01798-COA-R3-PT, 2020 WL 2893434, at *5 (Tenn. Ct. App. June 3, 2020) (affirming the trial court's finding that the mother had failed to provide the children with a suitable home when "the children were in the physical custody of Grandmother, but in the

---

[4] Mr. Sherfey testified that Father was arrested on February 8, 2018, but the affidavit of complaint, written by the arresting officer, stated that Father was arrested on the night of February 7, 2018. In addition, DCS's dependency and neglect petition cited Father's arrest date as February 7, 2018. Therefore, we conclude that Father was arrested on February 7, 2018.

legal custody of Mother at the time of removal").  Therefore, we find Father's postulate on this point unavailing.

Father also posits that DCS failed to make reasonable efforts to assist him in providing a suitable home for the Children as required by Tennessee Code Annotated § 36-1-102(1)(A)(ii)(c).  Specifically, Father contends that DCS failed to address the "primary issue within this entire custodial episode"—Father's substance abuse.  According to Father, DCS did not consult with jail staff to determine whether he could receive any manner of drug treatment while incarcerated.  In addition, Father contends that DCS sent him letters while he was incarcerated but failed to provide him any means to return communication.  For his part, Father asserts that he made reasonable efforts to provide a suitable home by obtaining housing and making repairs to the house while he was not incarcerated.  Father also contends that he tried to resolve several of his criminal charges.

In its final order, the trial court determined that the relevant four-month period by which to evaluate DCS's efforts began on February 8, 2018, and ended June 8, 2018.  The court also found that during this four-month determinative period, DCS made reasonable efforts to assist Father, which included:

Investigating possible relative placement for the children with family and friends of [Father];

Conducting a child and family team meeting to discuss the needs of [Father];

Maintaining contact with the children in their resource home to ensure that their needs were being met in foster care;

Ensuring that the medical needs of the children were assessed and addressed;

Upon his release from incarceration, scheduling visitation between [Father] and the children;

Scheduling, and attending, a CFTM [child and family team meeting] on March 5th 2018 to develop a permanency plan with [Father];

Drafting a permanency plan and, subsequently, presenting it for ratification by the Juvenile Court;

Offering transportation assistance to [Father];

Conducting a Quarterly Progress Review CFTM to update [Father and Mother] on their progress in completing the steps set out for them in the permanency plan;

- 10 -

Maintaining contact with [Father] to assess his needs and situation;

Offering to assess [Father's] home and personal condition to evaluate if his home and living situation were safe and appropriate for the children.

(Paragraph lettering omitted.)

The evidence presented at trial preponderates in favor of these findings. Mr. Sherfey testified that he conducted a Child and Family Team meeting ("CFTM") on March 5, 2018, to discuss a permanency plan. According to Mr. Sherfey, he reminded Father of the meeting via text messages, Father's preferred mode of communication. The CFTM notes from that meeting reflect that Father was not present despite having been notified. Mr. Sherfey also testified that he had arranged visits between the Children and Father before Father was re-incarcerated. Mr. Sherfey stated that he was unable to schedule more visits because of his inability to maintain consistent contact with Father. According to Mr. Sherfey, Father failed to inform DCS of where he was residing and failed to remain in contact with DCS. Mr. Sherfey further related that he offered Father transportation for visitation with the Children. In addition, DCS offered to assist Father in evaluating repairs that needed to be made to his home. Father rejected these offers of assistance.

With respect to efforts to place the Children with a family member, Mr. Sherfey reported that Paternal Grandmother was considered but presented drug abuse issues of her own. Mike Smith, the DCS case worker assigned to the case beginning in June 2020, testified that he did not request an Interstate Compact for the Placement of Children home study because he had only spoken to out-of-state relatives of Mother and Mother had believed these relatives to be inappropriate for placement.

The evidence at trial established that Father largely thwarted DCS's attempts to assist him during periods when he was not incarcerated. For example, Mr. Sherfey articulated that upon Father's release from jail in February 2018, Father indicated that he had a home in Bloomingdale that was uninhabitable and needed to be repaired. Mr. Sherfey explained:

The Department asked if we could get the address and do a walk-through to see what kind of safety concerns there were and also see if we could help him in any manner, and he refused services at that time and said that he was going to get it fixed, and then once he got it fixed, then I could come and do a walk-through at that time. Then shortly after that discussion, he was arrested again in April of 2018 and remained in jail until August of that same year.

In addition, Mr. Sherfey related that DCS had been unable to provide Father with drug addiction treatment due to Father's lack of communication. When asked whether Father

- 11 -

had completed an alcohol and drug assessment, Mr. Sherfey testified that Father had not completed the assessment because Mr. Sherfey could not "maintain any kind of normal contact" with Father. Moreover, Mr. Sherfey stated that after Father had tested positive for illicit drugs in September 2018, he attempted to arrange another drug test but never received a response from Father.

With respect to his own efforts, Father emphasizes in his appellate brief that he had obtained housing; begun to make repairs on the house; attempted to resolve his legal issues; acquired an employment opportunity upon his release; indicated that he might be released on April 26, 2021; and planned to live with his aunt upon his release. The trial court, however, determined that Father had not made any reasonable efforts to secure a suitable home environment for the Children. The court also found that Father did not have safe or stable housing and continued to experience unresolved drug issues, specifically noting Father's positive drug screen in September 2018. The court detailed that since the Children were removed to DCS custody, Father had obtained federal charges, pled guilty to those charges, and had remained in federal custody since December 2018. In addition, Father had no driver's license and no employment waiting upon his release. The court, however, afforded him credit for becoming an ordained minister while incarcerated. In sum, the court concluded that DCS's efforts were reasonable and equal to or in excess of Father's efforts.

The evidence supports the trial court's findings as to Father's minimal efforts. When questioned regarding what "proactive steps" he had been taking so that the Children could return to his custody and be "safe and drug free," Father responded: "I was trying to work on that house and have them home, but to be quite frank and honest, that house was the only thing I was working on." According to Father, he never obtained a legal source of income during the period of his release. Father further acknowledged that he had purchased the supplies to repair the house with funds related to a criminal conspiracy charge for which he had pled guilty in federal court. In addition, Father admitted that he never obtained a valid driver's license after his license was suspended.

With respect to his unlawful drug use, Father testified that he never completed the alcohol and drug assessment as required by the permanency plan. Although Father questioned the result of his failed drug test on September 13, 2018, he admitted that he had used marijuana and methamphetamine on August 20, 2018. Moreover, Father acknowledged that his drug abuse rendered him unmotivated to seek employment during periods when he was not incarcerated. Father acknowledged that he would need extensive treatment and counseling for his drug addiction upon his release.

Evidence introduced at trial also established that Father continued to participate in criminal activity. Father was re-arrested on April 18, 2018, and released on August 20, 2018. Father was arrested again on December 5, 2018, for offenses originating in the Commonwealth of Virginia. Resulting criminal charges included the felonious possession

- 12 -

of a firearm while committing or attempting to commit illegal manufacture, sale, or distribution of a controlled substance; felony possession of a controlled substance; felony possession of ten grams or more of methamphetamine; and ninety-five counts of possession of child pornography. At the time of trial in the case at bar, these charges were still pending. In addition, Father testified that he had pled guilty in federal court to criminal conspiracy and was awaiting a sentencing hearing scheduled for April 26, 2021.

Based on the evidence presented at trial, including Father's own testimony, we conclude that the trial court did not err by finding that Father had failed to make reasonable efforts to provide a suitable home for the Children or by finding that DCS had made reasonable efforts to assist equal to or in excess of Father's efforts. Due to Father's continued unlawful drug use, repeated incarceration, and lack of suitable housing, we agree with the court's finding that it was unlikely that Father could provide a suitable home for the Children at an early date. Ergo, we conclude that the trial court properly determined that clear and convincing evidence supported this statutory ground for termination of parental rights.

### 2. Abandonment by Incarcerated Parent

DCS also alleged, and the trial court determined, that Father had willfully failed to visit or support the Children under section 36-1-102(1)(A)(iv) (Supp. 2019), which provides:

> A parent or guardian is incarcerated at the time of the institution of an action or proceeding to declare a child to be an abandoned child, or the parent or guardian has been incarcerated during all or part of the four (4) months immediately preceding the institution of such action or proceeding, and either has failed to visit or has failed to support or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding such parent's or guardian's incarceration[.]

In accordance with the statutory language, we begin by defining the applicable four-month period by which to evaluate Father's efforts to visit or support the Children.

DCS filed its petition to terminate Father's parental rights on February 4, 2019. In its final order, the trial court found that Father had been incarcerated continuously since December 5, 2018, and had previously been incarcerated from April 18, 2018, through August 20, 2018. The court aggregated Father's total time of nonincarceration since the removal of the Children as February 8, 2018, to April 18, 2018, and August 20, 2018, to December 5, 2018, without narrowing this period to the four months of nonincarceration time preceding the filing of the termination petition. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) ("[A] four-month period shall be created by aggregating the shorter periods of nonincarceration beginning with the most recent period of nonincarceration prior to

- 13 -

commencement of the action and moving back in time."); *In re Travis H.*, No. E2016-02250-COA-R3-PT, 2017 WL 1843211, at *9 (Tenn. Ct. App. May 5, 2017) ("[T]he trial court was required to determine the four-month period by piecing together Father's periods of non-incarceration prior to the filing of the termination petition."). At trial, DCS proffered this time period as the determinative period, and Father's counsel agreed. However, this calculation would produce nearly a six-month period, rather than the statutorily required four-month determinative period.

Nevertheless, we conclude that this error was harmless because the time period utilized by the trial court included the proper four-month period. *See* Tenn. Code Ann. § 36-1-102(1)(A)(iv) ("A finding that the parent has abandoned the child for a defined period in excess of four (4) months that would necessarily include the four (4) months of nonincarceration immediately prior to the institution of the action, but which does not precisely define the relevant four-month period, shall be sufficient to establish abandonment[.]"); *see also In re J'Khari F.*, No. M2018-00708-COA-R3-PT, 2019 WL 411538, at *9 (Tenn. Ct. App. Jan. 31, 2019) ("[A] miscalculation of the relevant four-month period can be considered harmless when the trial court made sufficient findings of fact that encompassed the correct determinative period.").

In its appellate brief, DCS delineates the aggregated four-month period as April 4 to April 17, 2018 (14 days), plus August 21 to December 4, 2018 (106 days). We determine this to be an accurate calculation of the four-month period.[5]

a. Failure to Visit

Father asserts that he visited the Children on three occasions prior to the trial court's May 2018 order suspending his visitation. Father further faults DCS for failing to "attempt to maintain the bond between Father and [the Children] following his incarceration in December 2018," a time frame outside the applicable four-month period. In its final order, the court found that Father's last visit with the Children was on April 11, 2018, and that Father had willfully failed to visit the Children when he was not incarcerated. The second time during the four-month period in which Father requested a visit with the Children was unsuccessful due to his failed drug screen on September 13, 2018, pursuant to the court's May 2018 order. The court also found that DCS had attempted to schedule a second drug screen and visit in October 2018 but that Father had not responded to DCS's request. The

---

[5] Although the version of the statute applicable to the present case does not define how many days comprise a four-month period, the current version of Tennessee Code Annotated § 36-1-102(1)(A)(iv) (2021) provides: "(b) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of nonincarceration immediately preceding the filing of the action." Inasmuch as the amended version did not take effect until March 6, 2020, *see* 2020 Tenn. Pub. Acts, Ch. 525 § 1 (S.B. 1769), it does not apply to the present case. However, we find its language with respect to the aggregation of the four-month period to be instructive here.

- 14 -

court ultimately determined that Father had willfully failed to visit the Children because he was aware that visits were conditioned on his release from jail and clean drug tests yet failed to meet these conditions. The evidence presented at trial does not preponderate against the trial court's findings.

Mr. Sherfey testified that Father visited with the Children a week after the Children were removed to DCS custody in February 2018; on March 1, 2018; and on April 11, 2018, the final time he visited the Children. The visit on April 11, 2018, was the sole visit that took place within the four-month determinative period. According to Mr. Sherfey, Father reached out to DCS to schedule a visit upon his release from jail on August 20, 2018. However, Father was unable to visit with the Children at that time because he had tested positive for Suboxone, marijuana, and methamphetamine on September 13, 2018, in violation of the court's May 2018 order. Mr. Sherfey stated that Father's request for visitation following his release from jail in August 2018 was the only time that Father contacted DCS.

Father only visited the Children once during the determinative period. Although the trial court did not explicitly find that Father's sole visit constituted token visitation, we conclude that his visit was token, which is defined as visitation that "under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child." Tenn. Code Ann. § 36-1-102(1)(C) (2021). This Court has previously concluded that one visit over the course of a four-month period constitutes token visitation. *See In re Audrey S.*, 182 S.W.3d 838, 867 (Tenn. Ct. App. 2005) (determining that one or two visits during a four-month period is "nothing more than token visitation"); *In re Boston G.*, No. M2019-00393-COA-R3-PT, 2020 WL 2070399, at *4 (Tenn. Ct. App. April 29, 2020) (affirming the juvenile court's finding that one visit during the four-month period preceding the mother's incarceration constituted token visitation).

Furthermore, the evidence preponderates in favor of the trial court's finding that Father's failure to visit the Children was willful. With respect to a parent's willfulness in failing to visit or financially support, Tennessee Code Annotated § 36-1-102(I) (2021) provides:

> For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure[.]

- 15 -

Therefore, Father bore the burden of raising this affirmative defense and proving that he did not act willfully in failing to visit the Children.[6] Although his argument on appeal is unclear, Father appears to blame DCS for his failure to visit the Children due to DCS's purported failure to "maintain the bond between Father and the minor children following his incarceration in December 2018," and with the court in placing conditions on his ability to visit.

On appeal, DCS contends that Father has waived any argument concerning his lack of willfulness. Although Father failed to file an answer to DCS's termination petition and failed to raise lack of willfulness as an affirmative defense at trial, we determine that this affirmative defense was "tried in this case by implied consent." *See In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020); *see also* Tenn. R. Civ. P. 15.02 ("When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings.").

In *In re Serenity*, this Court concluded that the mother had raised the affirmative defense for the first time on appeal but that the issue had been tried by implied consent partially due to DCS's discussion of the mother's willfulness in its termination petition, the testimony offered by DCS with respect to the mother's failure to visit, and the trial court's findings concerning the mother's knowledge of the consequences of her failure to visit. *Id.* Similarly, in the present cause, DCS alleged in its termination petition that Father had "willfully failed to visit the children, although he was able to visit, he knew the children were in DCS custody" and "was aware of the requirements to visit." DCS also offered testimony with respect to Father's knowledge of the conditions precedent to visit as ordered by the court in its May 2018 order. In addition, the court specifically found that Father had acted willfully in failing to visit the Children because he was aware of the requirements to visit. Therefore, we will consider Father's argument that he did not willfully fail to visit the Children.

The evidence introduced demonstrated that Father knew the court had conditioned visitation on his release from jail and clean drug tests before visits, yet Father tested positive for Suboxone, marijuana, and methamphetamine and freely admitted at trial to using drugs during the four-month determinative period. As previously explained by this Court, "willfulness" does not require the same standard of culpability as is required by the criminal code, and it does not require "malevolence or ill will." *In re Audrey S.*, 182 S.W.3d at 863. Rather "[w]illful conduct consists of acts or failures to act that are

---

[6] Effective July 1, 2018, the General Assembly amended Tennessee Code Annotated § 36-1-102 to render the absence of willfulness to be solely an affirmative defense as it relates to a parent's failure to visit or failure to financially support. *See, e.g., In re Serenity S.*, No. E2019-00277-COA-R3-PT, 2020 WL 522439, at *7 (Tenn. Ct. App. Jan. 31, 2020). Because the termination petition in this case was filed on February 4, 2019, the amendment rendering the absence of willfulness as an affirmative defense, for which the parent carries the burden to of proof, applies here.

- 16 -

intentional or voluntary rather than accidental or inadvertent," and such conduct is the "product of free will rather than coercion." *Id.* Furthermore, this Court has previously determined: "A parent's choice to continue to use drugs when the parent is prohibited from visiting a child until passage of a drug test constitutes a willful failure to visit the child." *In re Morgan S.*, No. E2009-00318-COA-R3-PT, 2010 WL 520972, at *9 (Tenn. Ct. App. Feb. 12, 2010). Therefore, Father's failure to visit the Children during the determinative period was willful.

With respect to Father's postulate that DCS should have scheduled phone calls and video conferences with the Children while he was incarcerated, this Court's inquiry into the frequency and quality of visits is confined to the aggregated four-month period during which Father was not incarcerated. Father's contention concerning DCS's efforts during his incarceration is irrelevant with regard to this ground of abandonment. For the foregoing reasons, the trial court did not err in concluding by clear and convincing evidence that DCS met its burden in proving that Father willfully failed to visit the Children.

## b. Failure to Support

Concerning the trial court's determination that Father abandoned the Children by failing to provide financial support, Father argues that he had no means by which to make the $40.00 monthly payments ordered by the court. In support, he cites medical issues that arose from a 2017 car accident and his frequent incarceration. Tennessee Code Annotated § 36-1-102(1)(D) (2021) defines "failed to support" or "failed to make reasonable payments toward such child's support" as "the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child" and provides that the parent's ability to make only small payments is not a defense "if no payments were made during the relevant four-month period."

As with failure to visit, a parent may assert, as an affirmative defense, that the failure to provide financial support was not willful. Tenn. Code Ann. § 36-1-102(1)(I). However, the parent bears "'the burden of proof that the failure to . . . support was not willful' and must establish the lack of willfulness by a preponderance of evidence." *In re Braelyn S.*, No. E2020-00043-COA-R3-PT, 2020 WL 4200088, at *8 (Tenn. Ct. App. July 22, 2020) (quoting Tenn. Code Ann. § 36-1-102(1)(I)). "Failure to support is willful when a parent is aware of the duty to support and has the ability but makes no attempt to provide support and has no justifiable excuse for failure to do so." *In re Mattie L.*, 618 S.W.3d 335, 345 (Tenn. 2021). Furthermore, parents who are at least eighteen years of age or older are presumed to know of their legal obligation to support their children. Tenn. Code Ann. § 36-1-102(1)(H).

Similar to his failure to visit, Father failed to raise lack of willfulness as an affirmative defense in his trial pleadings or in his defense at trial. However, we again

conclude that the affirmative defense was tried by implied consent inasmuch as DCS addressed Father's willfulness in its termination petition and DCS and Father introduced evidence of his income and ability to pay at trial. Furthermore, the trial court found in its final order that Father maintained the ability to pay the child support payments, knew of his responsibility to support the Children, and knew of the potential consequences for failing to do so. *See In re Serenity S.*, 2020 WL 522439, at *7. Although the court did not make an explicit finding as to Father's willfulness, it concluded that he had failed to make reasonable payments toward the Children's support despite being "able bodied and able to pay the twenty dollars a month child support."[7] The court specifically noted that Father had testified that he did not provide any financial support and had no "good reason for not doing so." The court also found that it had explained to Father his duty to financially support the Children and the potential consequences of his failure to do so at the July 25, 2018 hearing.

Although Father argues that he lacked the ability to provide financial support due to his frequent incarceration and physical injuries sustained in a car accident, the evidence presented at trial does not support this conclusion. Concerning Father's physical injuries, Father explained that he was in a car accident in October 2017. As a result of the accident, Father fractured his skull, lapsed into a coma, and underwent a complete hip replacement. Initially, Father testified that his hip prevented him from working and that he had been pursuing disability benefits before he was incarcerated. However, Father subsequently related that he was planning to work for a roofing company upon his release from prison and that he was unsure as to whether he would continue to seek disability benefits.

Despite the difficulty with his hip, Father testified that prior to his incarceration he had been working on his house, which required repairs to the roof. When pressed concerning how he purchased supplies for home repairs, Father responded: "That involves with my conspiracy case I'm involved in." Father did not elaborate further on this point; however, he later acknowledged that he was earning money during his period of nonincarceration but not paying the ordered child support.

Based on Father's own testimony, it is evident that Father was earning income during the determinative period and had the ability to work as evinced by the physical labor he performed relative to his house. Therefore, inasmuch as Father failed to make any payments toward the Children's support, admitted to earning money during the determinative period, and acknowledged that he had no excuse for failing to make such payments, we conclude that the evidence established the trial court's finding of this ground of abandonment by clear and convincing evidence.

---

[7] Pursuant to the trial court's September 7, 2019 order and the permanency plan, Father was ordered to pay a total of $40.00 per month as financial support for the Children. In stating that Father was ordered to pay $20.00 per month in its final order, it appears the court intended to reference Father's obligation to pay $20.00 per child per month. We consider this erroneous finding to be harmless in effect.

c. Wanton Disregard

Concerning this ground of statutory abandonment, Father argues that his past behavior does not exhibit a "pattern" of criminality, that his "serious criminal issues related to his drug misuse" are "largely resolved," and that his release from prison could be imminent. However, by presenting these arguments, Father ostensibly misses the fundamental inquiry. In evaluating this ground for termination, neither this Court nor the trial court are focused upon the present resolution of the parent's criminal issues or imminent release from prison; rather, the proper focus is on the parent's past activity that generated the parent's legal issues and precipitated the parent's incarceration. *See In re Isabella W.*, No. E2019-01346-COA-R3-PT, 2020 WL 2070392, at *10 (Tenn. Ct. App. Apr. 29, 2020) (noting that the father's arguments erroneously focused on his behavior while incarcerated whereas the relevant consideration was the father's conduct prior to incarceration).

With regard to this termination ground, this Court has previously explained:

Tenn. Code Ann. § 36-1-102(1)(A)(iv) also reflects the commonsense notion that parental incarceration is a strong indicator that there may be problems in the home that threaten the welfare of the child. Incarceration severely compromises a parent's ability to perform his or her parental duties. A parent's decision to engage in conduct that carries with it the risk of incarceration is itself indicative that the parent may not be fit to care for the child. Taxonomy of Children's Rights, 11 WM. & MARY BILL RTS. J. at 958. However, parental incarceration is not an infallible predictor of parental unfitness. Accordingly, Tenn. Code Ann. § 36-1-102(1)(A)(iv)'s second test for abandonment does not make incarceration alone a ground for the termination of parental rights. An incarcerated or recently incarcerated parent can be found guilty of abandonment only if the court finds, by clear and convincing evidence, that the parent's pre-incarceration conduct displayed a wanton disregard for the welfare of the child. Thus, the parent's incarceration serves only as a triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child.

*In re Audrey S.*, 182 S.W.3d at 866 (footnote omitted) (emphasis added). Moreover, this Court has stated that "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child can, alone or in combination, constitute conduct that exhibits a wanton disregard for the welfare of a child." *Id.* at 867-68.

- 19 -

In concluding that DCS had proven this ground of abandonment, the trial court made the following findings of fact:

[Father] has engaged in conduct that exhibits a wanton disregard for the children's welfare by:

a) Using illegal drugs in that on March 1st 2018 a hair follicle sample was taken and the results were positive for Methamphetamine level 100,415 pg/mg; Cocaine level of 21,675 pg/mg;

b) On September 6th 2017 he was charged with aggravated criminal trespass;

c) On January 22nd 2018 he was charged with domestic assault;

d) On February 8th 2018, the date of removal, he was arrested and charged with simple possession, unlawful possession of a weapon, maintaining a dwelling for drug use, and driving on a suspended license;

e) On February 15th 2018 he was charged with failure to appear relating to a charge from September 6th 2017 and was arrested on April 18th 2018;

f) On December 5th 2018 he was arrested and charged in Virginia with possession of a gun with schedule II drugs; manufacturing controlled substance; carrying a concealed weapon, possession of a blackjack [weapon], driving without a license, driving without proof of insurance, and being held on a warrant for extradition;

g) Due to his use of illegal drugs in the home with the children they were exposed to harmful, illegal substances in that on February 1st 2018 the child [Harmony's] hair was collected for testing and was positive for Methamphetamine, Cocaine, and Buprenorphine exposure; That on February 12th 2018 the child [Erin's] hair was collected for testing and was positive for Methamphetamine exposure;

h) On January 24th 2018 the father was incarcerated on assault charges, and left the children with his paramour and the home was observed to be messy and the children were sharing a twin size mattress in the floor; The children's mother was present in the home; The father's paramour had allowed the mother to stay at the home while the father was incarcerated so that she could assist in caring for the children. Both the mother and the father's paramour refused to submit to urine drug screens on this date. The mother reported that she had recently used drugs while she was out partying, but she would not identify what drugs she used. The father's paramour admitted that she used Benzodiazepine within the past two weeks and Subutex and THC within the past month.

The proof developed was that [Father] admitted that when the children were living with him and in the home that he would use methamphetamine and other drugs quite regularly as were the children's mother and also his girlfriend at that time. He knew that these women were using these drugs. He testified that he always went outside to another building when he used methamphetamine. The Court does not find that testimony to be credible.

[Father] tested positive for methamphetamine and denied using right before he tested positive. The Court finds that is just too much of a coincidence for these children to test positive for these drugs with their dad being around using them all of the time for the Court to believe that he did not contribute or know that the others were contributing to the children's exposure to these drugs.

[Father] left the children with inappropriate care givers and his explanation for that was while he was in jail he had to have someone there to take care of them or they might end up in DCS custody.

[Father] testified that he had not been dating his girlfriend very long so that is why he left them in care of their mother who he knew was using drugs as well as his girlfriend.

DCS has proven, by clear and convincing evidence, the ground of abandonment by incarcerated parent abandonment by wanton disregard against [Father].

(Paragraph numbering omitted.) Upon careful review, we conclude that the evidence presented during trial preponderates in favor of these findings.

- 21 -

As noted in *In re Audrey S.*, incarceration alone is not a ground for termination. 182 S.W.3d at 866. However, the parent's incarceration acts as a "triggering mechanism that allows the court to take a closer look at the child's situation to determine whether the parental behavior that resulted in incarceration is part of a broader pattern of conduct that renders the parent unfit or poses a risk of substantial harm to the welfare of the child." *Id.* Such a pattern of conduct may consist of "probation violations, repeated incarceration, criminal behavior, substance abuse, and the failure to provide adequate support or supervision for a child . . . ." *Id.* at 867-68.

The evidence presented at trial established that Father had engaged in nearly all of the conduct listed in *Audrey*. Father admitted to using methamphetamine while the Children were in his custody. Although Father testified that he never used illicit drugs inside the home, the trial court did not find this testimony credible. Father also acknowledged that he knew that Mother and his paramour used drugs, yet he left the Children in their supervision. As a consequence of their exposure to illicit drugs in the home, Harmony tested positive for exposure to methamphetamine, cocaine, and buprenorphine while Erin tested positive for exposure to methamphetamine.

DCS also proffered evidence establishing that Father had been in and out of jail many times during the Children's young lives. On January 19, 2016, Father was convicted of criminal trespass and sentenced to thirty days of incarceration. On February 23, 2017, Father was convicted of possession of drug paraphernalia and failure to provide proof of automobile insurance, resulting in a sentence of eleven months and twenty-nine days on probation with ten days to serve in jail. Father was arrested again on September 6, 2017, and convicted of criminal trespass. Father was sentenced to thirty days in jail. Father was arrested on January 22, 2018, and charged with domestic assault against Paternal Grandmother. He was convicted of this offense and sentenced to eleven months and twenty-nine days, suspended to probation.

On February 7, 2018, Father was arrested and was charged with, *inter alia*, driving on a suspended license, possession of a firearm during the commission of a dangerous felony, and maintaining a dwelling for drug use. On April 18, 2018, Father was arrested for failing to appear at a court hearing and remained incarcerated until August 20, 2018. Father was arrested again on December 5, 2018, for charges originating in the Commonwealth of Virginia, which included the felonious possession of a firearm while committing or attempting to commit illegal manufacture, sale, or distribution of a controlled substance; felony possession of a controlled substance; felony possession of ten grams or more of methamphetamine; and ninety-five counts of possession of child pornography. In addition, Father testified that he had pled guilty to a criminal conspiracy charge and was awaiting sentencing in federal court.

Based on Father's history of drug abuse, repeated incarceration, and numerous criminal convictions, we determine that the trial court did not err in concluding by clear

and convincing evidence that Father had abandoned the Children by exhibiting a wanton disregard for their welfare. *See In re S.L.A.*, 223 S.W.3d 295, 299 (Tenn. Ct. App. 2006) ("Wanton disregard for the welfare of the child can be established by the parent's previous criminal conduct along with a history of drug abuse.").

### B. Substantial Noncompliance with Permanency Plan

Father contends that he completed all the steps of the permanency plan that he could have while incarcerated. The trial court, however, found by clear and convincing evidence that Father had failed to substantially comply with the statement of responsibilities set forth in the permanency plan. With respect to this statutory ground, the trial court made the following finding of facts:

> [Father] refused to sign the plans and was provided copies and his requirements were explained to him at the hearing on July 25th 2018.

> This Honorable Court ratified the initial permanency plans on July 25th 2018 as in the children's best interests and found that the requirements for [Father] were reasonably related to remedying the reasons for foster care.

> The Court finds that [Father] has not substantially complied with the responsibilities and requirements set out for him in the permanency plans to wit: He failed to maintain safe and stable housing. DCS attempted to inspect his home and he would not let them and reported it was not suitable. He failed to meet the conditions precedent in order to visit with the children and therefore did not visit. He failed to obtain or maintain a legal source of income. He failed to obtain a reliable means of transportation. He failed to complete an alcohol and drug assessment. He failed to take and pass random drug screens, and test negative for all illegal substances. He only participated in one drug screen on September 13th 2018 which was positive for Buprenorphine, THC, and Methamphetamine. He failed to sign a release of information for the Department to look at his medical records and other records. He failed to resolve his legal issues, failed to cooperate with probation, and incurred new criminal charges.

> [Father] testified that he had failed to comply with those responsibilities.

> The Court finds that although [Father] had several periods of incarceration, during the time he was not incarcerated he did not attempt to complete any task on his permanency plan.

The Court finds that, as of the date of hearing, the permanency plans are reasonable and related to remedying the reasons for which the children were placed into foster care, such that, had [Father] cooperated with the same, it would have addressed the reasons for which the children were in DCS custody.

(Paragraph numbering omitted.) Upon thorough review of the record, we find that the evidence at trial does not preponderate against these findings.

Tennessee Code Annotated § 36-1-113(g)(2) (2021) provides as a ground for termination of parental rights:

There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4[.]

To terminate parental rights pursuant to Tennessee Code Annotated § 36-1-113(g)(2), the parent's noncompliance with the permanency plan must be substantial. *See In re Valentine*, 79 S.W.3d 539, 548 (Tenn. 2002). Additionally, our Supreme Court has held that "the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that requirement." *Id.* This Court has explained the following regarding the ground of substantial noncompliance with the permanency plan:

Mere noncompliance is not enough to terminate a parent's rights. *In re Valentine*, 79 S.W.3d [539,] 548 [(Tenn. 2004)]. Additionally, the unsatisfied requirement(s) must be important in the plan's scheme. *Id.* A "[t]rivial, minor, or technical" deviation from the permanency plan's requirements does not qualify as substantial noncompliance. *In re M.J.B.*, 140 S.W.3d [643,] 656 [(Tenn. Ct. App. 2004)] (citing *In re Valentine*, 79 S.W.3d at 548). Improvements in compliance are construed in favor of the parent. *In re Valentine*, 79 S.W.3d at 549 (citing *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 961 (Tenn. Ct. App. 1996)). Yet, we must determine compliance in light of the permanency plan's important goals:

In our view, a permanency plan is not simply a list of tasks with boxes to be checked off before custody is automatically restored. Rather, it is an outline for doing the things that are necessary to achieve the goal of permanency in children's lives. We think that where return to parent is the goal, parents must complete their responsibilities in a manner that demonstrates that they are willing and able to resume caring

- 24 -

> for their children in the long-term, not on a month-to-month
> basis.
>
> *In re V.L.J.,* No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at \*8 (Tenn.
> Ct. App. Dec. 30, 2014).

*In re Abbigail C.*, No. E2015-00964-COA-R3-PT, 2015 WL 6164956, at \*20-21 (Tenn. Ct. App. Oct. 21, 2015).

The permanency plan, developed on March 5, 2018, and ratified on July 25, 2018, specified Father's responsibilities, which included: (1) participate in at least 4.3 hours of visitation with the Children per month; (2) pay $40.00 per month in child support; (3) make necessary repairs to home and allow DCS to conduct a walk-through to ensure its suitability; (4) maintain proper utilities for at least three months; (5) complete an alcohol and drug assessment; (6) ensure his paramour complies with random drug screens, completes an alcohol and drug assessment, and follows any recommendations from the assessment if he plans to keep her in his life; (7) ensure that no one living with him or in his life is under the influence of alcohol or drugs; and (8) resolve all of his criminal charges, follow rulings of the court, and avoid receiving new criminal charges.

We first note that these requirements were reasonable and "related to remedying the conditions that necessitate[d] foster care placement," *see* Tenn. Code Ann. § 37-2-403(2)(C) (2021), which herein included Father's incarceration and drug use. Moreover, we agree with the trial court's finding that Father failed to substantially comply with the responsibilities outlined in the permanency plan. As previously noted, Father visited the Children on a total of three occasions during the entire time the Children were in DCS custody, failing to visit with them for 4.3 hours per month. Father also acknowledged that he had failed to make any payments toward the Children's support. Although Father testified that he had worked towards repairing his home, Mr. Sherfey testified that Father rejected any assistance from DCS and never shared the address with DCS. Father never completed an alcohol and drug assessment and continued to use illicit drugs. Father also continued to incur new criminal charges and convictions.

Based on the evidence presented, we conclude that Father's conduct resulted in substantial noncompliance with the goals and responsibilities of the permanency plan. Father did not "complete [his] responsibilities in a manner that demonstrate[d] that [he was] willing and able to resume caring for [the Children] in the long-term." *See In re V.L.J.*, No. E2013-02815-COA-R3-PT, 2014 WL 7418250, at \*8 (Tenn. Ct. App. Dec. 30, 2014). We therefore determine that clear and convincing evidence supported this statutory ground for termination as well.

## D. Persistence of Conditions

The trial court also found clear and convincing evidence of the statutory ground of persistence of the conditions leading to removal of the Children from Father's home or physical and legal custody. Regarding this statutory ground, Tennessee Code Annotated § 36-1-113(g)(3) (2021) provides:

(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard[.]

In the instant case, the Children were removed from Father's custody on February 8, 2018, following the filing of a dependency and neglect petition. The Children were in DCS custody continuously through trial, which occurred nearly three years after their removal. In its initial dependency and neglect petition, DCS cited allegations of drug exposure, lack of supervision, and environmental neglect, as well as Father's incarceration. In finding that the conditions that had led to the removal of the Children persisted, the trial court made the following findings of fact:

DCS removed the children from their home because of drug exposure, environmental neglect, criminal activity, homelessness, and incarceration.

The conditions that led to the removal still persist to wit: [Father] continues to have unaddressed substance abuse issues; he continues to lack stable housing or sufficient income to support himself and the minor children; continues to lack appropriate parenting skills.

Other conditions exist that, in all reasonable probability, would lead to further neglect or abuse of the children because [Father] has exposed or allowed the children to be exposed to Methamphetamine and Cocaine, as evidence[d] by their hair follicle drug screens; he remains incarcerated and will be so for the foreseeable future.

There is little chance that those conditions will be remedied soon so that the children can be returned safely to [Father's] custody.

Continuation of the parent/child relationship greatly diminishes the children's chances of being placed into a safe, stable and permanent home.

(Paragraph numbering omitted.)

The evidence preponderates in favor of these findings as well. At the time of trial, Father was incarcerated for criminal charges he had acquired in the Commonwealth of Virginia, which included multiple drug charges. In addition, Father failed the two drug screens that he participated in while he was not incarcerated, testing positive in March 2018 for methamphetamine and cocaine and in September 2018 for methamphetamine, marijuana, and Suboxone. Father acknowledged that he would need extensive counseling and drug treatment upon his release from prison.

In addition, Father stated that he was scheduled to be sentenced concerning his criminal conspiracy charge on April 26, 2021, and that he expected to be released on probation. However, Father also conceded that there was no guarantee he would receive a probationary sentence and that he could receive a sentence of up to two and one-half years. It is also unknown how Father's Virginia charges will be resolved. Kayla Gilliam, the DCS case worker assigned to this case from December 2018 until June 2020, testified that Father's Virginia charges had not yet been adjudicated when she was assigned to the case.

Ultimately, Father's pattern of incarceration and drug abuse persisted at the time of trial. The Children had remained in DCS custody for nearly three years, and during that period, Father had been in and out of jail, had received new criminal charges and convictions, and had continued to use illicit drugs when he was not incarcerated. Therefore, we agree with the trial court in its finding that there was little likelihood that the conditions leading to removal would be remedied at an early date so that the Children could be returned safely to Father. Furthermore, given the length of time that the Children had spent in DCS custody with no progress made by Father to improve the conditions leading

- 27 -

to removal, it is clear that continuation of the parent-child relationship would further inhibit the Children's ability to integrate into a stable home. We therefore determine that the trial court did not err in concluding that clear and convincing evidence also established this statutory ground for termination.

### E. Severe Child Abuse

The trial court also determined that Father had committed severe child abuse by exposing the Children to or allowing the Children to be exposed to drugs such as cocaine and methamphetamine. On appeal, Father argues that he did not intentionally expose the Children to drugs. With respect to this statutory ground, Tennessee Code Annotated § 36-1-113(g)(4) (2021) provides:

> (4) The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tennessee Code Annotated § 37-1-102(27) (2021) defines "severe child abuse" as:

> (A)(i) The knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[.]

The trial court's finding of severe child abuse was predicated on Father's long history of drug use and possession in the home, his positive test for methamphetamine and cocaine in March 2018, his February and December 2018 drug charges, his prior knowledge that Mother and D.C. used drugs, and the fact that the Children tested positive for exposure to drugs in February 2018. The evidence at trial preponderates in favor of the trial court's findings with regard to this ground.

In arguing that DCS presented insufficient evidence to prove severe child abuse, Father first points to his own trial testimony that he stored his drugs in an inoperable automobile and another building rather than inside the home. However, the trial court specifically found that Father's testimony was not credible on this point, and we will not re-evaluate the court's credibility assessment inasmuch as trial courts are "uniquely positioned to observe the demeanor and conduct of witnesses." *See Kelly v. Kelly*, 445 S.W.3d 685, 692 (Tenn. 2014) (quoting *State v. Binette*, 33 S.W.3d 215, 217 (Tenn. 2000)); *see also Wells v. Tenn. Bd. of Regents,* 9 S.W.3d 779, 783 (Tenn. 1999) ("[A]ppellate courts will not re-evaluate a trial judge's assessment of witness credibility absent clear and convincing evidence to the contrary."). In this instance, the trial court found that Father's

testimony that "he only used drugs outside the home or in an outbuilding is without credibility."

Father also contends that he did not intentionally expose the Children to drugs. However, DCS was not charged with proving that Father acted intentionally. DCS only needed to prove by clear and convincing evidence that Father acted knowingly. *See* Tenn. Code Ann. § 37-1-102(27)(A)(i). Concerning the "knowing" element of severe child abuse, this Court has explained:

> It is also important to understand the threshold for finding that a parent or caregiver's conduct was "knowing." In child abuse cases, the parent or caregiver may deny that the injury was purposefully inflicted, and where the injuries are inflicted on preverbal infants and children, there is often no witness to the injury other than the parent or caregiver. The "knowing" element can and often must be gleaned from circumstantial evidence, including but not limited to, medical expert testimony on the likelihood that the injury occurred in the manner described by the parent or caregiver. Moreover, "knowing" conduct by a parent or caregiver is not limited to conduct *intended* to cause injury:
>
> > The term "knowing" as used in Section 37-1-102(b)(23) is not defined by statute. . . In the context of the dependency and neglect statutes, the term has been described as follows:
> >
> > > We consider a person's conduct to be "knowing," and a person to act or fail to act "knowingly," when he or she has actual knowledge of the relevant facts and circumstances or when he or she is either in deliberate ignorance of or in reckless disregard of the information that has been presented to him or her.

*In re S.J.*, 387 S.W.3d 576, 592 (Tenn. Ct. App. 2012) (quoting *In re Samaria S.*, 347 S.W.3d 188, 206 (Tenn. Ct. App. 2011) (internal citations omitted)).

As explained above, whether a parent acted knowingly is often evinced by circumstantial evidence. Although DCS did not present direct evidence to indicate that Father knowingly allowed the Children to be exposed to drugs within the household, such as an admission from Father, the circumstantial evidence presented by DCS demonstrates that Father had knowledge of "relevant facts and circumstances" indicating the Children's exposure to harmful drugs.

DCS's packet of background paperwork, entered into evidence as an exhibit, contains the results of drug screens reflecting that Harmony tested positive for exposure to methamphetamine and cocaine and that Erin tested positive for exposure to methamphetamine on February 12, 2018, four days after their removal from Father's custody. Mr. Sherfey also testified that Harmony tested positive for exposure to methamphetamine, cocaine, and buprenorphine on February 1, 2018. According to Mr. Sherfey, the Children were residing in Father's home at the time of their removal. In addition, Mother and D.C. were living in the home. Father testified that he never used drugs in the home but that he stored and would use drugs in an inoperable car or an outbuilding on the property. As previously noted, the trial court did not find Father's testimony related to this claim to be credible.

Father also testified that he was aware that Mother and D.C. used drugs. Father related that when he was arrested, he left the Children with Mother and D.C. When asked whether he thought the Children were exposed to methamphetamine by Mother's or D.C.'s drug use, he stated: "Well, I know it wouldn't have been from me. So it would have to be. I know it was a poor decision, very poor."

At the time of the Children's removal, all three of their caregivers were using drugs. Father tested positive for methamphetamine, buprenorphine, cocaine, and marijuana on March 1, 2018, three weeks after the removal of the Children. Mother also tested positive for methamphetamine on February 28, 2018. Father explained that D.C. and he would use methamphetamine together. Notes from the March 5, 2018 CFTM reflect that D.C. had recently tested positive for methamphetamine, buprenorphine, cocaine, and opiates.

These circumstances, considered together, demonstrate that Father either knowingly exposed the Children to drugs himself or allowed the Children to be exposed to drugs by Mother or D.C. This Court has previously affirmed a trial court's finding of severe child abuse based on similar circumstances. In *In re A.L.H*, the trial court found that (1) the children tested positive for exposure to methamphetamine; (2) the father and mother were living with the children during this time; (3) the father tested positive for methamphetamine; (4) the mother tested positive for opiates; (5) the parents knew, or should have known, that the maternal grandmother was using methamphetamine; (6) the parents allowed the children to stay with the maternal grandmother; (7) the father blamed the children's drug exposure on the mother and DCS; and (8) the father was not a credible witness. *In re A.L.H.*, No. M2016-01574-COA-R3-JV, 2017 WL 3822901, at *3 (Tenn. Ct. App. Aug. 31, 2017). This Court determined that the trial court did not err by finding that the children were victims of severe child abuse based on these findings of fact. *Id.* The findings of fact in *A.L.H.* are nearly identical to the findings of fact in the present case. We conclude that these combined circumstances served to undergird and establish the trial court's finding of severe child abuse.

In his appellate brief, Father contends that he did not leave the Children with Mother or D.C. after he was arrested in February 2018, asserting that he left the Children with Paternal Grandmother, whom he did not know was using drugs.[8] However, Mr. Sherfey testified that the Children were removed from Father's home and that Mother and D.C. were living in the home at the time. Father also answered affirmatively when questioned whether the Children were "staying at your house with your girlfriend and the children's mother" at the time of his February 2018 arrest. Therefore, we find Father's argument on this point unpersuasive and affirm the trial court's finding of this termination ground by clear and convincing evidence.

### F. Failure to Manifest an Ability and Willingness to Assume Custody of or Financial Responsibility for the Children

Concerning this statutory ground, Tennessee Code Annotated § 36-1-113(g)(14) (2021) provides:

> A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child[.]

To prove this ground, DCS was required to show by clear and convincing evidence that (1) Father failed to manifest either an ability or willingness to assume custody or financial responsibility of the Children and (2) returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *In re Neveah M.*, 614 S.W.3d 659, 674, 677 (Tenn. 2020); *In re Jeremiah S.*, No. W2019-00610-COA-R3-PT, 2020 WL 1951880, at *6 (Tenn. Ct. App. Apr. 23, 2020) ("Under this ground for termination, the petitioner must prove each element by clear and convincing evidence.").

The trial court stated the following findings of fact and conclusions of law with regard to this ground:

> [Father] failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the children.
>
> Placing the children in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children.

---

[8] DCS alleged in its dependency and neglect petition that Paternal Grandmother had tested positive for methamphetamine, amphetamine, buprenorphine, hydrocodone, oxycodone, and benzodiazepine.

[Father] is currently incarcerated and without the financial ability to provide for himself or the children; He has not visited the children since April 11th 2018, and has no[] parent/child relationship with them; when he was not incarcerated he did not maintain contact with DCS and did not cooperate with efforts to reunite him with the children; He has shown by his acts and omissions that the children were not a priority in his life, and he chose a life of crime and substance abuse instead.

DCS has proven, by clear and convincing evidence, the ground for termination contained in T.C.A. § 36-1-113(g)(14) against [Father].

Father acknowledges that he currently does not have the ability to care for the Children given his incarceration. However, he argues that he might be released in April 2021 and that upon his release, he will have employment and a drug-free residence. Although Father acknowledges that DCS presented evidence that the Children had bonded with their foster parent, he asserts that they spent a significant amount of their lives under Father's care. Upon careful review of the record, we agree with the trial court and determine Father's arguments to be unavailing.

The evidence demonstrated that Father lacks the ability to assume legal and physical custody of and financial responsibility for the Children. Father was incarcerated at the time of trial and had a sentencing hearing scheduled for April 26, 2021, in which he was to be sentenced for criminal conspiracy. Father urged that he was likely to be released on probation if he cooperated with the prosecuting attorney. However, Father also testified that there was no guarantee that he would be released and that he could be sentenced to spend up to two and one-half years in prison. In addition, Father has been charged with numerous counts of serious offenses in Virginia, and no evidence was presented to indicate when or how these charges may be resolved.

Father also testified that he planned to be employed by a roofing company upon his release but acknowledged that he could not recall the last time he had worked for this company. Father contends on appeal that "[m]any of his issues could be addressed while the children resided" with him. However, Father also related that he would need extensive drug treatment and counseling upon his release. We fail to see how Father would have the ability to assume custody of and financial responsibility for the Children while several of his criminal charges and drug addiction issues remain unresolved. Based on Father's testimony, we agree with the trial court and conclude that he had no ability to assume legal and physical custody of or financial responsibility for the Children.

Although DCS needed to prove only Father's failure to manifest an ability or his failure to manifest a willingness as it relates to this ground, we likewise conclude that Father also lacked the willingness to assume legal and physical custody of or financial

- 32 -

responsibility for the Children. *See In re Neveah M.*, 614 S.W.3d at 677 ("If a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied."). We recognize Father's testimony at trial that he was highly motivated to regain custody of the Children. However, as this Court has previously explained:

> When evaluating willingness, we look for more than mere words. Parents demonstrate willingness by attempting to overcome the obstacles that prevent them from assuming custody or financial responsibility for the child.

*In re Cynthia P.*, No. E2018-01937-COA-R3-PT, 2019 WL 1313237, at *8 (Tenn. Ct. App. Mar. 22, 2019) (internal citations omitted).

Father's actions spanning the nearly three years that had elapsed since the Children's removal by the time of trial demonstrated that Father had failed to manifest a willingness to regain custody of the Children. *See In re Keilyn O.*, No. M2017-02386-COA-R3-PT, 2018 WL 3208151, at *8 (Tenn. Ct. App. June 28, 2018) (finding that a parent had failed to manifest a willingness to assume custody because, *inter alia*, she "was incarcerated and had completed virtually none of her plan responsibilities" by the time of trial); *In re Amynn K.*, No. E2017-01866-COA-R3-PT, 2018 WL 3058280, at *15 (Tenn. Ct. App. June 20, 2018) ("Father's actions, including his continued criminal activity and his failure to financially support the Child, raise doubt as to Father's actual willingness to assume custody or financial responsibility for the Child.").

Since the Children were removed in February 2018, Father's actions reflected a lack of concern for the Children and a lack of willingness to assume legal and physical custody of or financial responsibility for the Children. When Father was not incarcerated, he did not secure a legal source of income or cooperate with DCS in its attempts to help him evaluate the suitability of his home and its needed repairs. In fact, Father did not maintain regular contact with DCS. Father continued to incur new criminal charges and convictions, and Father continued to use illicit drugs as evinced by his September 2018 positive drug screen. Father also failed to substantially comply with the parental responsibilities outlined in the permanency plan. Although Father may have insisted that he was eager and willing to regain custody of the Children, his actions demonstrated that he was not willing to overcome major obstacles to regaining custody.

DCS was also required to prove that returning the Children to Father's custody would pose a risk of substantial harm to the Children's welfare. *See In re Neveah M.*, 614 S.W.3d at 674, 677. This Court has previously observed:

> The courts have not undertaken to define the circumstances that pose a risk of substantial harm to a child. These circumstances are not amenable to precise definition because of the variability of human conduct. However, the

use of the modifier "substantial" indicates two things. First, it connotes a real hazard or danger that is not minor, trivial, or insignificant. Second, it indicates that the harm must be more than a theoretical possibility. While the harm need not be inevitable, it must be sufficiently probable to prompt a reasonable person to believe that the harm will occur more likely than not.

*In re Maya R.*, No. E2017-01634-COA-R3-PT, 2018 WL 1629930, at \*8 (Tenn. Ct. App. Apr. 4, 2018) (quoting *Ray v. Ray*, 83 S.W.3d 726, 732 (Tenn. Ct. App. 2001)).

Although the trial court's statement that "[p]lacing the children in [Father's] legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the children" was somewhat conclusory, we determine that the evidence at trial does not preponderate against this finding. Father has unresolved drug addiction issues and unresolved criminal charges that would create an unpredictable and potentially traumatic environment for the Children. Father never completed an alcohol and drug assessment, and Father acknowledged that he would require extensive treatment and counseling for his drug addiction issues upon his release.

Conversely, the Children are thriving with their foster mother ("Foster Mother"). According to Mr. Smith, at the time of trial, the Children referred to Foster Mother as "Mom," and Foster Mother was willing to adopt them. Mr. Smith testified that the Children were "very happy" in Foster Mother's care. Mr. Smith also stated that the Children were excelling in school, had made friends, and had presented no behavioral issues. According to Mr. Smith, the Children rarely spoke of Father, and in Mr. Smith's estimation, the Children maintained no bond with Father. The last time Father had visited the Children was on April 11, 2018, nearly three years prior to trial, and according to Mr. Smith, Father had the ability to write them letters but never did.

Given Father's unresolved legal issues, history of drug abuse, and current incarceration, as well as the bond established between Foster Mother and the Children and their success under her care and custody, we affirm the trial court's finding that the return of the Children to Father's custody would pose a risk of substantial harm to their welfare. *See In re Amynn K.*, 2018 WL 3058280, at \*15 (partially citing the child's bond with the foster parents, who had custody for four years, in affirming the trial court's finding of this statutory ground); *In re Ke'Andre C.,* No. M2017-01361-COA-R3-PT, 2018 WL 587966, at \*11 (Tenn. Ct. App. Jan. 29, 2018) (noting that the parents had "knowingly engaged in repeated criminal conduct that necessitated their re-incarceration" in finding that returning the children to the parents would pose a risk of substantial harm). Upon careful review, we conclude that clear and convincing evidence supports this statutory ground as well.

V. Best Interest of the Children

When a parent has been found to be unfit by establishment of at least one statutory ground for termination of parental rights, as here, the interests of parent and child diverge, and the focus shifts to what is in the child's best interest. *In re Audrey S.*, 182 S.W.3d at 877; *see also In re Carrington H.*, 483 S.W.3d at 523 ("The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." (quoting *In re Angela E.*, 303 S.W.3d 240, (Tenn. 2010))). Tennessee Code Annotated § 36-1-113(i) provides a list of factors the trial court is to consider when determining if termination of parental rights is in a child's best interest. This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest. *See In re Carrington H.*, 483 S.W.3d at 523; *In re Audrey S.*, 182 S.W.3d at 878 ("The relevancy and weight to be given each factor depends on the unique facts of each case."). Furthermore, the best interest of a child must be determined from the child's perspective and not the parent's. *White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004).

The version of Tennessee Code Annotated § 36-1-113(i) (Supp. 2020) in effect when the termination petition was filed in the instant action listed the following factors for consideration:[9]

    (1)    Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

    (2)    Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

    (3)    Whether the parent or guardian has maintained regular visitation or other contact with the child;

    (4)    Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

---

[9] Effective April 22, 2021, the General Assembly has amended Tennessee Code Annotated § 36-1-113(i) by deleting the previous subsection in its entirety and substituting a new subsection providing, *inter alia*, twenty factors to be considered in determining a child's best interest in a case involving termination of parental rights. *See* 2021 Tenn. Pub. Acts, Ch. 190 § 1 (S.B. 205). However, because the termination petition in this case was filed prior to the effective date of the amendment, the statutory best interest factors provided in the prior version of the statute are applicable here. *See, e.g.*, *In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

(5)     The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6)     Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7)     Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8)     Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9)     Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

As our Supreme Court has instructed regarding the best interest analysis:

"The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." In re Angela E., 303 S.W.3d [240,] 254 [(Tenn. 2010)].

When conducting the best interests analysis, courts must consider nine statutory factors listed in Tennessee Code Annotated section 36-1-113(i). These statutory factors are illustrative, not exclusive, and any party to the termination proceeding is free to offer proof of any other factor relevant to the best interests analysis. In re Carrington H., 483 S.W.3d at 523 (citing In re Audrey S., 182 S.W.3d 838, 878 (Tenn. Ct. App. 2005)). Facts considered in the best interests analysis must be proven by "a preponderance of the evidence, not by clear and convincing evidence." In re Kaliyah S., 455 S.W.3d [533,] 555 [(Tenn. 2015)] (citing In re Audrey S., 182 S.W.3d at 861). "After making the underlying factual findings, the trial court should then consider the combined weight of those facts to determine whether they amount to clear and convincing evidence that termination is in the child's best interest[s]." Id. When considering these statutory factors, courts must

- 36 -

remember that "[t]he child's best interests [are] viewed from the child's, rather than the parent's, perspective." In re Audrey S., 182 S.W.3d at 878. Indeed, "[a] focus on the perspective of the child is the common theme" evident in all of the statutory factors. Id. "[W]hen the best interests of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interests of the child. . . ." Tenn. Code Ann. § 36-1-101(d) (2017).

Ascertaining a child's best interests involves more than a "rote examination" of the statutory factors. In re Audrey S., 182 S.W.3d at 878. And the best interests analysis consists of more than tallying the number of statutory factors weighing in favor of or against termination. White v. Moody, 171 S.W.3d 187, 193-94 (Tenn. Ct. App. 2004). Rather, the facts and circumstances of each unique case dictate how weighty and relevant each statutory factor is in the context of the case. See In re Audrey S., 182 S.W.3d at 878. Simply put, the best interests analysis is and must remain a factually intensive undertaking, so as to ensure that every parent receives individualized consideration before fundamental parental rights are terminated. In re Carrington H., 483 S.W.3d at 523. "[D]epending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." In re Audrey S., 182 S.W.3d at 878 (citing White v. Moody, 171 S.W.3d at 194). But this does not mean that a court is relieved of the obligation of considering all the factors and all the proof. Even if the circumstances of a particular case ultimately result in the court ascribing more weight—even outcome determinative weight—to a particular statutory factor, the court must consider all of the statutory factors, as well as any other relevant proof any party offers.

*In re Gabriella D.*, 531 S.W.3d 662, 681-82 (Tenn. 2017).

In determining that terminating Father's parental rights was in the best interest of the Children, the trial court found that all but one of the nine statutory factors weighed in favor of terminating Father's parental rights. The court determined that Tennessee Code Annotated § 36-1-113(i)(8) did not apply to the present case and, therefore, did not weigh in favor of or against termination. Following our thorough review, we conclude that clear and convincing evidence supports the court's conclusion that termination of Father's parental rights was in the best interest of the Children.

Concerning the first factor, whether Father has made an adjustment of circumstance, conduct, or conditions, the trial court properly weighed this factor in favor of termination. Father's circumstances have not changed. Father was still incarcerated at the time of trial,

received new criminal charges and convictions through the months following the Children's removal, and has yet to undergo treatment for his drug addiction issues.

With respect to the second factor, whether Father has "failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible," DCS attempted to assist Father in assessing necessary repairs to his house, scheduled visitation, and attempted to maintain contact with Father. Father, however, did not stay in contact with DCS, refused DCS assistance with respect to his house repairs, and continued to acquire additional criminal charges and convictions as well as to use illicit drugs.

Father posits that DCS did not do enough to maintain contact with him while he was incarcerated, specifically noting that DCS mailed Father letters with no ability for Father to communicate a response. The evidence at trial belies this assertion. Father related at trial that he sometimes had funds to send mail and was provided five envelopes every week. Father also contends that DCS did not arrange for him to benefit from services or rehabilitation programs provided by the jails or prisons where he resided. However, Father testified that he was not eligible for any such programs.

The trial court also found that the third factor, whether Father maintained regular visitation with the Children, and the fourth factor, whether Father had maintained a meaningful bond with the Children, weighed in favor of termination. Father only visited the Children three times during the entirety of DCS custody. By trial, Father had not seen the Children in nearly three years and had not endeavored to write to the Children. Mr. Smith testified that the Children rarely spoke of Father. The court did not err in weighing these factors in favor of termination.

Concerning the fifth statutory factor, the effect a change of caretakers and physical environment would likely have on the Children's emotional, psychological, and medical condition, we also agree that this factor weighed in favor of termination. The Children were thriving in the care and custody of Foster Mother at the time of trial. Foster Mother had provided the Children with much needed stability. They had bonded to her and had not seen or heard from Father in several years.

With regard to the sixth factor, whether Father or a person residing with Father had shown "brutality, physical, sexual, emotional or psychological abuse, or neglect" to the Children or another member of the household, the trial court cited the Children's exposure to illicit drugs when weighing this factor in favor of termination. We determine that the court did not err in this respect.

The trial court weighed the seventh factor in favor of termination as well. The seventh factor addresses several elements, including whether Father's physical environment is healthy and safe, whether there is criminal activity in the home, and whether

there is use of controlled substances that may render Father unable to care for the Children in a safe and stable manner. Considering the Children's exposure to drugs in Father's home, we conclude that the court did not err in weighing this factor in favor of termination.

The eighth factor concerns Father's mental and emotional status and whether this status would affect his ability to safely care for the Children. The trial court found that this factor was not applicable and, therefore, did not weigh it in favor of or against termination. Based on the lack of evidence concerning Father's mental or emotional status, we determine that the court erred by weighing the factor neutrally instead of against termination. *See In re Braelyn S.*, 2020 WL 4200088, at *20 ("In the absence of evidence that tied Father to abuse, an unsafe home, or an unstable mental or emotional state, we must conclude that these factors weigh against termination."); *In re London B.*, No. M2019-00714-COA-R3-PT, 2020 WL 1867364, at *12 (Tenn. Ct. App. Apr. 14, 2020) (concluding that the eighth factor weighed against termination because no proof related to the father's mental or emotional status was presented). However, we conclude that the trial court's finding concerning factor eight represents harmless error because overall the best interest analysis weighs against maintaining Father's parental rights to the Children.

With regard to the ninth factor, whether Father paid child support consistent with the child support guidelines, as previously addressed, Father did not make any child support payments. Therefore, the trial court did not err in weighing this factor in favor of termination.

In sum, the trial court found that Father showed little interest in the Children and was debilitated by his drug addiction. Ultimately, Father did not initiate steps to make changes to his lifestyle necessary to provide the Children with a safe and stable home environment or an attentive parent. Father argues that he has become an ordained minister while incarcerated, has resolved "the bulk of his criminal issues," and could be released from prison soon. However, while positive measures, we find such efforts to be "too little, too late" inasmuch as the Children had been in DCS custody for nearly three years at the time of trial, Father continued to receive new criminal charges and convictions, and Father continued to use drugs when not incarcerated. *See, e.g.*, *In re A.W.*, 114 S.W.3d 541, 564-47 (Tenn. Ct. App. 2003) (affirming the trial court's finding that the parent's improvements made since the filing of the termination petition were "'too little, too late.'"). We agree with the trial court's determination by clear and convincing evidence that termination of Father's parental rights was in the best interest of the Children.

## VI. Conclusion

For the foregoing reasons, we affirm the trial court's judgment. This case is remanded to the trial court, pursuant to applicable law, for enforcement of the trial court's judgment terminating Father's parental rights to the Children and collection of costs assessed below. Costs on appeal are assessed to the appellant, Harvey Lee N.

s/ Thomas R. Frierson, II
THOMAS R. FRIERSON, II, JUDGE